UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SAVORY PIE GUY, LLC f/k/a CHOCRA CHOCOLATE LLC, on behalf of itself and all others similarly situated,<br><br>           Plaintiff,<br><br>     v.<br><br>COMTEC INDUSTRIES, LTD.,<br><br>           Defendant. | Civil Action No.: 7:14-CV-07527-VB<br><br>**DECLARATION OF THOMAS J. PRUSA, PH.D.** |

I, Thomas J. Prusa, Ph.D., state:

1.     I am over twenty-one years of age and am fully competent to make this declaration. I have personal knowledge of the facts set forth in this declaration and, if called upon as a witness, I could and would testify to such facts under oath.

2.     I submit this declaration in support of Savory Pie Guy LLC's opposition to Comtec Industries, Ltd.'s motion for summary judgment.

## INTRODUCTION

3.     I was retained by counsel for the plaintiff, Savory Pie Guy LLC (hereinafter, "SPG"), to analyze issues associated with SPG's antitrust claims against defendant Comtec Industries Ltd. (hereinafter, "Comtec").

## II.     QUALIFICATIONS

4.     I am a Professor of Economics at Rutgers – The State University of New Jersey, a prominent state university located in New Jersey. I began teaching in 1988.

5.     I specialize in the application of economic, financial, statistical, and econometric analyses. I have over 16 years of experience consulting on matters involving industrial organization, international trade disputes, intellectual property, antitrust, and

commercial litigation issues. My antitrust experience includes serving as an expert consultant in disputes involving steel contracts between Electrolux and Bing Steel and AK Steel, and also as an expert consultant on behalf of Silgan Containers, LLC in the Department of Justice's review of Mittal Steel's merger with Arcelor Steel.

6.      I received my Bachelor's Degree in economics from Georgetown University in 1983, a Masters Degree in economics from Stanford University in 1985, and a Ph.D. in Economics from Stanford University in 1988.

7.      A true and correct copy of my curriculum vita, which further describes my experience and qualifications, is attached as Exhibit A to my November 23, 2015 Initial Report. The cases in which I have testified as an expert in the last four years are the following: Certain Orange Juice from Brazil, USITC Investigation No. 731-TA-1089 (Review) (Decision: March 2012, Publication 4311); Food and Drug Administration Investigation, Orange Juice from Brazil, 2012; Silicomanganese from Brazil, China, and Ukraine, USITC Investigations No. 731-TA-671-673 (Third Review) (Decision: October 2012, Publication 4354); Grain-Oriented Electrical Steel from China, Czech Republic, Germany, Japan, Korea, Poland, and Russia, USITC Investigation Nos. 701-TA-505 and 731-1231-1237 (Decision: August 2014); Cut-To-Length Carbon Steel Plate from China, Russia, and Ukraine, USITC Investigations No. 731-TA-753-754, and 731-TA-756 (Third Review) (Decision: November 2015).

8.      My analysis in this case makes use of numerous information sources. Among these are the following:

- the complaint and counterclaim in this action;
- Comtec's Amended Answers to Plaintiff's Interrogatory No. 5 (identifying companies whom Comtec believes to be its competitors);
- Plaintiff's answers to Comtec's interrogatories;
- the complaint and consent judgment in Comtec's lawsuit against Jim Sutton d/b/a Inline Pies;

- the statement by Sean Mandel, principal of SPG, dated November 23, 2015;

- the report by Chris Greenwald dated November 23, 2015;

- Comtec's November 12, 2013 ban letter to SPG;

- my internet research of the relevant market and market participants, as described herein;

- my verbal communications with Linda Hoskins from Colborne Foodbotics;

- purchase orders received by SPG;

- excerpts from Mr. Mandel's handwritten notebooks from 2014;

- email correspondence sent and received by SPG and potential customers regarding purchase orders;

- email correspondence sent and received by SPG and third parties regarding SPG's production model and its need to transition;

- SPG's financial statements from 2013-2015;

- ████████████████████████████████████████████

- ████████████████████████████████████████████
  █████████████████████████████████████████
  ████████████████████████

- my verbal communications with Sean Mandel;

- the Declaration of James Sutton in Support of SPG's opposition to Comtec's motion for summary judgment; and

- my verbal communications with James Sutton.

### III.      CASE BACKGROUND

9.      In its complaint, SPG alleges that Comtec engaged in monopolization and attempted monopolization in violation of Section 2 of the Sherman Antitrust Act, 15 U.S.C. §2, *et seq*. SPG alleges that in order to secure and maintain Comtec's market power, Comtec prohibits its customers from purchasing parts, or services for its pressing machines from any of Comtec's competitors. SPG further alleges that Comtec enforces this prohibition by refusing to deal with customers who purchase parts or services from third parties. Additionally, SPG alleges that Comtec secured and maintained its market power by suing its former competitor, Jim Sutton d/b/a InLine Pie, and restraining it from doing business in the relevant market.  SPG alleges that it was injured and damaged by Comtec's conduct.

10.      For the purposes of forming my opinions, I have relied upon the facts in Mr. Mandel's signed statement of November 23, 2015[1] regarding the products and services sold by Comtec, the companies identified by Comtec as competitors, and the use of those products, and I have assumed that SPG will be successful in proving those facts at trial.

11.      I have been asked to opine whether the evidence supports SPG's allegations that (1) Comtec has market power (aka monopoly power), (2) Comtec's actions reflect an intent or attempt to maintain or extend that power, (3) Comtec's actions caused antitrust injury, and (4) SPG has sustained damages from Comtec's antitrust violations and if so, in what amount.

### IV.      ECONOMIC AND LEGAL BACKGROUND

12.      In its most basic form, a monopoly exists in a market where there are many buyers but only one seller.  A pure monopoly is rare, but many markets exist in which the

---

[1] A copy of Mr. Mandel's statement is attached as Exhibit B to my November 23, 2015 Initial Report.

number of sellers is very limited and/or one seller holds a very large share of the market. A supplier does not have to be the sole supplier in a market to be considered a monopoly. A seller with dominant (or exclusive) market share is said to hold monopoly power in that market.

13.    In a competitive market, sellers price products at marginal cost; that is, a price high enough to cover the sellers' variable costs (in the short and medium run) or total costs (in the long run).  The realistic prospect of buyers switching to alternative suppliers limits the pricing power of competitive firms.

14.    In contrast, a seller with monopoly power can raise prices above its marginal cost without concern that competitors will erode its market share by offering lower prices. When the use of monopoly power harms competition or consumers, antitrust laws can be applied to minimize that harm.[2]

15.    In forming my opinions, I have relied on the following legal principles, of which I have been advised by counsel for SPG.  Under section 2 of the Sherman Act, 15 U.S.C. § 2, the offense of monopolization requires the plaintiff to demonstrate: "(1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." *United States v. Grinnell Corp.*, 384 U.S. 563, 570–71 (1966). Under the same section, the offense of attempted monopoly under the same section requires the plaintiff to demonstrate (1) anti-competitive conduct; (2) intent to monopolize; and (3) a dangerous probability of obtaining monopoly power. *International Distrib. Centers, Inc. v. Walsh Trucking Co.*, 812 F.2d 786, 790 (2d Cir. 1987).

---

[2] See generally Pindyck, Robert S. and Rubinfeld, Daniel L., *Microeconomics* 7th ed Upper Saddle River, N.J: Pearson Prentice Hall, 2009, at 349-50, 361-63.

16.    A company will be found to have willfully acquired or maintained monopoly power under the monopolization claim, and engaging in anti-competitive conduct under the attempted monopoly claim, if it refuses to deal with customers that do business with a monopolist's competitors.  *See, e.g., Lorain Journal Co. v. United States*, 342 U.S. 143 (1951) ("The principal question here is whether a newspaper publisher's conduct [refusing to sell ads to customers who also advertised on competing radio station] constituted an attempt to monopolize interstate commerce, justifying the injunction issued against it under §§ 2 and 4 of the Sherman Antitrust Act. For the reasons hereafter stated, we hold that the injunction was justified."); *see also Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398 (2004); *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585 (1985); *In re Elevator Antitrust Litig.*, 502 F.3d 47, 53 (2d Cir. 2007) (refusal to deal is actionable "when a monopolist seeks to terminate a prior (voluntary) course of dealing").

17.    Under the Sherman Act, a plaintiff is entitled to recover damages suffered as of the date the cause of action accrued and all future damages flowing from the defendant's illegal conduct. *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 401 U.S. 321, 338 (1971).

## V.       ECONOMIC EVIDENCE RELATING TO SPG'S ANTITRUST CLAIMS

### A.       The Market Definition: Semi-Automatic Presses In The United States.

18.    Economists use market definition as a tool in evaluating potentially anti-competitive conduct and its effects.

> "A properly defined market includes all firms that compete with each other but excludes all noncompetitors.  To identify competitors, substitutability on the part of both consumers and producers should be considered.  If two products are used for similar purposes by consumers, the firms making those products ought to be regarded as competitors.  Also, if two goods are

produced using similar production processes, then their producers are also potential competitors." [3]

19.    A "too-broad definition … includes too many firms, with the results that reported measures of market power tend to be biased downward."[4] The Department of Justice Merger Guidelines similarly warn that:

> "Defining a market broadly to include relatively distant product or geographic substitutes can lead to misleading market shares.  This is because the competitive significance of distant substitutes is unlikely to be commensurate with shares in a broad market.  Although excluding more distant substitutes from the market inevitably understates their competitive significance to some degree, doing so often provides a more accurate indicator of the competitive effects of the merger than would be the alternative of including them and overstating their competitive significance as proportional to their shares in an expanded market."[5]

As a result, in defining a relevant market, economists focus only on products that are considered "close substitutes" for each other.[6]

20.    Thus, the relevant product market and geographic market must be defined. Based on the information I have reviewed, it is my opinion that the relevant market is the market for <u>semi-automatic</u> pie presses in the <u>United States</u>.

21.    Manual and fully automatic pie presses are not in the same market as semi-automatic pie presses because of substantial differences in their size, acquisition cost, maintenance costs, usability, flexibility, operability and output, all of which would make manual and fully automatic pie presses inappropriate for small bakeries. Simply because each type of press forms dough does not mean that all types of pie presses are "close substitutes" any more than a commercial pick-up truck is a close substitute for either a Mini Cooper or an 18-wheel tractor trailer truck simply because they are all vehicles used

---

[3] Waldman, Don E., and Jensen, Elizabeth Jane. *Industrial organization: theory and practice.* 4th ed. Reading, Mass: Addison-Wesley, 2012, at p.93.
[4] *Id.*
[5] U.S. Department of Justice and the Federal Trade Commission, *Horizontal Merger Guidelines*, August 19, 2010, [hereinafter, "*Horizontal Merger Guidelines*" at § 4.
[6] *Id.*

for transportation.  A bakery wanting to purchase a semi-automatic pie press to make pies is unlikely to purchase a manual press or fully-automated pie press instead because those devices would not fulfill its goals in terms of operability, usability, cost, and production volume. I also do not believe that dough sheeters are part of the relevant market, based they are used to flatten dough into a sheet for the production of laminated dough products rather than to press dough directly in baking tins to create pie shells of custom sizes.  Pie presses are used for different baking applications than sheeters.

22.    I further believe that the relevant geographic market is limited to the United States.  Pie presses manufactured and sold outside the United States are functionally distinct from domestic presses to American consumers.  Foreign-made pie presses are not compatible with U.S.-based electrical sources and would require costly rewiring if a customer attempted to use such a machine in the United States, assuming that such rewiring is even possible in light of the considerable rules and regulations in the United States.  In addition, it does not appear that the products are certified to meet federal regulations, and some appear to have parts made of materials that are not acceptable for food service equipment in the United States. Finally the foreign manufacturers do not appear to offer service in the United States for their products.  For all of these reasons, a small bakery in the United States would be unlikely to substitute a foreign-manufactured pie press for a domestically manufactured pie press.

23.    The concept of cross price elasticity is often considered by economists when considering whether two products are close substitutes.  The cross elasticity of demand or cross-price elasticity of demand measures the responsiveness of the quantity demanded for a good to a change in the price of another good, holding all other factors constant.  It is measured as the percentage change in quantity demanded for the first good that occurs in response to a percentage change in price of the second good. A negative cross elasticity denotes two products that are complements, while a positive cross elasticity denotes two substitute products.  If the two products are close substitutes, the

cross elasticity will be a large positive number.  For example, butter and margarine are substitutes.  Economists have documented that the demand for margarine is highly sensitive to the price of butter.  In the context of pie presses, one could examine how the demand for, say, semi-automatic presses varied as the price for fully automatic pie presses changed.  For the reasons stated in this report, the end user requirements and application of these two different types of pie presses imply that their cross price elasticity is very close to zero (if not exactly zero). For example, if the price for a fully automatic press (costing more than $100,000) were to drop by, say, $5000, the demand for a semi-automatic price (costing $10,000) would be unlikely to change substantially, or perhaps at all. Said differently, the two types of pie presses are distinct markets. Accordingly, it is my opinion that the market for semi-automatic pie press is inelastic.

24.    Having defined these markets, it is necessary to analyze Comtec's position in the markets to determine whether it has the market power to restrain competition.

### B.    Comtec Has Developed and Maintained a Monopoly In the Semi-Automatic Pie Press Market.

25.    Market concentration is a concept regularly used by economists to evaluate possible harm to competition.  When a market is dominated by one or two major players, the risk of abuse are far greater than when a market is divided among many participants who are economically motivated to compete against each other. In general, a more concentrated market implies less competition.

26.    The Herfindahl-Hirschman Index (HHI) is a standard metric of market concentration used by the U.S. Department of Justice to evaluate potential mergers.[7] It is

---

[7] *Horizontal Merger Guidelines* at § 5.2.

also regularly used in antitrust litigation to assess market concentration. The individual market shares of participating firms are used to compute the HHI.[8]

27.    Another method economists use to measure market concentration is the concentration ratio.[9] A concentration ratio is a measure of the total output produced in an industry by a given number of firms in the industry. The most common concentration ratios are the $CR_4$ and the $CR_8$, which analyze the market share of the four and the eight largest firms. The individual market shares of the four and eight largest participants in the market are used to compute concentration ratios.

***Comtec's Market Share.***

28.    Assuming that the facts in Exhibit B are proven at trial, it would be my opinion that Comtec exercises market power in the relevant market, i.e., semi-automatic pie presses sold in the United States.

29.    Of all the competitors identified by Comtec, only six companies in the world manufacture semi-automatic presses. Of those, only two, Angel Equipment and Jim Sutton d/b/a InLine Pie, are located in the United States.  For the reasons stated above, it is my view that the companies outside the United States do not sell products in the relevant market.

30.    Where, as here, sales data is unavailable, economists use the "best available" evidence of market share for computing market concentration. I have reviewed abundant evidence confirming that Comtec controls the overwhelming majority of the relevant market and has a much greater share of the market than its competitors.

---

[8] To determine the level of concentration, the individual market shares of firms with significant market share is squared, then summed, to calculate a number between 0 and 10,000. *Id.*

[9] While early studies used concentration ratios to measure an industry's structure, the HHI has been the preferred measure for at least 30 years, in part, because it is a more conservative measure of market concentration.

31.    In particular, I reviewed Comtec's representations in its complaint against Jim Sutton d/b/a Inline Pies, stating that it is the "largest seller of dough forming equipment in the North America for entry-level pastry production," the "industry leader," it has "thousands of customers," and that it "has manufactured more than ten thousand dough-forming machines," since its founding in 1968. Accordingly, Comtec's average annual sales over the last 28 years have exceeded 200 presses per year.

32.    Additionally, I have reviewed the November 23, 2015 statement of Sean Mandel and the Declaration of James Sutton stating that: (i) the machine offered by Jim Sutton d/b/a InLine Pie has only been available for a short time period (i.e., Sutton started selling the presses in 2015); (ii) the installed base of semi-automatic presses made by Angel and InLine Pie in the baking industry is very small; and (iii) that annual sales of Angel and Jim Sutton are combined less than twenty-five presses.

33.    I did a Google search, a search of Ebay, and reviewed several internet websites specializing in used bakery equipment[10] to investigate new and used semi-automatic presses available for sale. I was unable to find any listings of used pie presses from Comtec's competitors.  In contrast, I found several listings of used Comtec machines.  Although used machinery sales are not used to directly analyze shares of the market for new equipment, the fact that I only found used Comtec machines listed for sale confirms that Comtec has a predominate share of the semi-automatic pie press market and that I have not missed any competitors. My research did not identify any other manufacturers of semi-automatic pie presses in the United States.

34.    I also reviewed Plaintiff's answer to Comtec's interrogatory number 1, which states that "[I]n late 2011 or early 2012, [Comtec CEO] Jim Reilly informed Sean Mandel on a telephone call that Comtec had 90% of the market and 'everyone' uses

---

[10] E.g., www.bakeryequipment.com,  www.sigmaequipment.com, www.bid-on-equipment.com.  Ebay had listing for new Inline presses, but the seller was the manufacturer, Mr. Sutton.

Comtec machines." While this statement does not explicitly state a time frame, it is reasonable to infer that the reference was to at least a year, probably longer.  The longer time period will, in most cases, strengthen the conclusion that Comtec has market power.

35.    Finally, I spoke with Linda Hoskins, an employee of Colborne Foodbiotics, about the market for pie presses. Ms. Hoskins told me "Comtec is the market leader in the 'niche' semi-automatic pie press market and that Colborne does not sell machines in the semi-automatic market." I also reviewed Colborne's website and I did not find any semi-automatic pie presses manufactured by Colborne listed for sale. The Colborne website lists a E-500 Econ-O dough forming pie press, but it is my understanding that press is manufactured by Angel Equipment. My understanding is based on: (i) the fact the photo of the press shows Angel's logo on it; (ii) the press is also listed for sale on Angel's website; and (iii) Mr. Sutton confirmed that Angel manufacturers this press.

36.    I have found no evidence that Mr. Reilly's statement regarding Comtec's ninety percent market share was incorrect. Further, based on my review of all available information (described above), I conclude that Comtec has at least a 50% market share, likely much higher. However, given that I must estimate the market shares based on the available evidence, I have made assumptions regarding the respective market shares that produce HHI scores and market concentration ratios that are *lower* than what they would be with more detailed data about market share. Said differently, my market concentration estimates are conservative: I am reporting <u>lower bound</u> calculations for market concentrations.  Further, I have computed the HHI and market concentration ratios under three alternate scenarios – in which Comtec has a 90%, 70%, and 50% market share. As described below, Comtec has market power in this highly concentrated market under *all three scenarios*.

### *The HHI Score Indicates the Relevant Market is Highly Concentrated.*

37.    A firm with a pure monopoly (100% market share) would generate a score of 10,000 and, although unrealistic, a perfect competitive market with many firms, each

possessing an insignificant market share, would have a score close to zero.  These two
extreme values are seldom observed in practice.  Nearly all products, markets, and
industries are on the spectrum.  Between these two end-points, the Department of Justice
assigns descriptors to the possible scores.  A market is considered unconcentrated if the
HHI is below 1,500, moderately concentrated if from 1,500 to 2,500 and highly
concentrated above 2,500.[11] As there are only three relevant suppliers (including
Comtec), and as Comtec claims to supply 90% of the relevant market, Comtec's share
produces an HHI of at least 8,150, more than three times the score needed to be
considered "highly concentrated" and well on the way to a pure monopoly score of
10,000.  If Comtec supplies only 70% of the market, the share would produce an HHI
score of at least 5,350, more than twice the benchmark for a market to be considered
highly concentrated. This score is consistent with a finding that Comtec has a well-
entrenched monopoly in the U.S. market for semi-automatic pie presses.  Even if Comtec
only supplies 50% of the U.S. market, the HHI would be at least 3,750 – a value well
above the threshold for a highly concentrated market. My calculations are depicted in the
chart below:

### THREE FIRM ANALYSIS (COMTEC PLUS 2 OTHERS)

| | Market Share | | | HHI Calculation | | |
|---|---|---|---|---|---|---|
| Firm | Scenario A | Scenario B | Scenario C | Scenario A | Scenario B | Scenario C |
| 1 (Comtec) | 50.0% | 70.0% | 90.0% | 2500.0 | 4900.0 | 8100.0 |
| 2 | 25.0% | 15.0% | 5.0% | 625.0 | 225.0 | 25.0 |
| 3 | 25.0% | 15.0% | 5.0% | 625.0 | 225.0 | 25.0 |
| Total | 100% | 100% | 100% | 3750.0 | 5350.0 | 8150.0 |
| Implied HHI | 3,750.0 | 5,350.0 | 8,150.0 | | | |

---

[11] *Id.*

38.    In each of these scenarios, the implied HHI is above the Department of Justice's 2,500 threshold for a highly concentrated market. My conclusion that the market for semi-automatic pie presses is highly concentrated is not sensitive to a finding that the only three relevant competitors are in the U.S. market.  Based on the information I have been provided, the high-end estimate for the total number of international suppliers of semi-automatic press machines is the six competitors plus Comtec, for a total of seven. These are the three U.S. firms (Comtec, Angel, and Inline), three U.K. suppliers (John Hunt, Crypto Peerless, Camwheat Pie Machine) and one South African manufacturer (Pie Design & Solutions).  For the moment, I will ignore the serious usability limitations associated with the machines made by the foreign suppliers, wiring and electricity issues, and the lack of service and parts.  All of these considerations will mean the following HHI estimates will be lower than their true value (i.e., will indicate the market is more competitive than it actually is).  Nonetheless, these estimates are instructive as they indicate how highly concentrated this market is even when one makes conservative assumptions.  If Comtec has 90% of the U.S. market (and the other six account for the residual 10%), the HHI is at least 8,116, a value more than three time larger than the threshold for a market to be considered highly concentrated.  If Comtec has 70% of the U.S. market, the HHI is at least 5,050.  This is more than twice the threshold value required for a market to be considered to be highly concentrated.  Finally, if Comtec has only 50% of the U.S. market, the HHI is at least 2,916.   Like every HHI computed this value is above the threshold for the U.S. Department of Justice to consider the market highly concentrated. These calculations are reflected in the following chart:

**SEVEN FIRM ANALYSIS (COMTEC PLUS 6 OTHERS)**

| | Market Share | | | HHI Calculation | | |
|---|---|---|---|---|---|---|
| Firm | Scenario A | Scenario B | Scenario C | Scenario A | Scenario B | Scenario C |
| 1 (Comtec) | 50.0% | 70.0% | 90.0% | 2500.0 | 4900.0 | 8100.0 |
| 2 | 8.33% | 5.0% | 1.67% | 69.444 | 25.0 | 2.778 |
| 3 | 8.33% | 5.0% | 1.67% | 69.444 | 25.0 | 2.778 |
| 4 | 8.33% | 5.0% | 1.67% | 69.444 | 25.0 | 2.778 |
| 5 | 8.33% | 5.0% | 1.67% | 69.444 | 25.0 | 2.778 |
| 6 | 8.33% | 5.0% | 1.67% | 69.444 | 25.0 | 2.778 |
| 7 | 8.33% | 5.0% | 1.67% | 69.444 | 25.0 | 2.778 |
| Total | 100% | 100% | 100% | 2916.667 | 5050.0 | 8116.667 |
| Implied HHI | 2,916.7 | 5,050.0 | 8,116.7 | | | |

***Market Concentration Ratios Indicate the Relevant Market is Highly Concentrated.***

39.    Below I provide charts showing the calculation of the 4-firm and 8-firm concentration ratios using multiple scenarios:

**THREE FIRM ANALYSIS (COMTEC PLUS 2 OTHERS)**

| | Market Share | | | $CR_4$ Calculation | | |
|---|---|---|---|---|---|---|
| Firm | Scenario A | Scenario B | Scenario C | Scenario A | Scenario B | Scenario C |
| 1 (Comtec) | 50.0% | 70.0% | 90.0% | 100 | 100 | 100 |
| 2 | 25.0% | 15.0% | 5.0% | | | |
| 3 | 25.0% | 15.0% | 5.0% | $CR_8$ Calculation | | |
| | | | | Scenario A | Scenario B | Scenario C |
| Total | 100% | 100% | 100% | 100 | 100 | 100 |

### SEVEN FIRM ANALYSIS (COMTEC PLUS 6 OTHERS)

| Firm | Market Share | | | CR$_4$ Calculation | | |
| | Scenario A | Scenario B | Scenario C | Scenario A | Scenario B | Scenario C |
|---|---|---|---|---|---|---|
| 1 (Comtec) | 50.0% | 70.0% | 90.0% | 75 | 85 | 95 |
| 2 | 8.33% | 5.0% | 1.67% | | | |
| 3 | 8.33% | 5.0% | 1.67% | CR$_8$ Calculation | | |
| | | | | Scenario A | Scenario A | Scenario A |
| 4 | 8.33% | 5.0% | 1.67% | | | |
| 5 | 8.33% | 5.0% | 1.67% | 100 | 100 | 100 |
| 6 | 8.33% | 5.0% | 1.67% | | | |
| 7 | 8.33% | 5.0% | 1.67% | | | |
| Total | 100% | 100% | 100% | | | |

40.     Each of these concentration ratios indicates that the market is highly concentrated. For comparison, I note that the motor vehicle industry, traditionally considered by economists as a highly concentrated industry had a 4-firm concentration ratio of 90 and an 8-firm concentration ratio of 95 in 1987. A classic early study empirically found that CR$_8$ of 70 was the critical level associated with non-competitive behavior and higher profits.[12] Therefore, it is my opinion that under both the concentration ratio and the HHI measure, and under any of the scenarios I analyzed above, Comtec operates in a highly concentrated industry. This industry is thus highly susceptible to the exercise of market power, which in my opinion, Comtec has exercised.

41.     Comtec's longevity in the industry, entrenched customer loyalties, and substantial investments in marketing and advertising, are significant barriers that enable Comtec to maintain its market share and exercise market power.

### C.     Comtec Has Used Techniques Well-Recognized By Economists to Discourage or Entirely Exclude Companies Wishing Sell to Parts and Services for the Comtec Pie Presses.

---

[12] *See* Joe S. Bain, "Relation of Profit Rate to Industry," The Quarterly Journal of Economics, Vol. 65 (1951), 293-324.

42.     Based on my review of the evidence, I agree that Comtec has engaged in anticompetitive conduct in the way that SPG alleges.  I have reviewed the letter that Comtec sent to SPG after it learned that SPG purchased a die set from Comtec's competitor Jim Sutton d/b/a InLine Pie.  In the letter, Comtec announces that it will refuse to provide any parts or services to *any* machines owned by SPG (even those that may never have been used with dies created by Mr. Sutton), as well as refuse to sell SPG any new machines or parts or services for those machines. Comtec's refusal to deal with SPG appears to be punitive in nature. Comtec's policy of refusing to deal with its customers that purchase parts or services for Comtec presses from Comtec's competitors has the effect of chilling competition in the market for parts and services for Comtec presses.  The anti-competitive intent of Comtec's actions against SPG are confirmed by the Declaration of James Sutton wherein he testifies that, in resolving a copyright infringement matter, Comtec demanded Sutton cease making parts that could conceivably be used on a Comtec machine (even if such parts were made for a competitor's machine) and required Sutton to provide the names and addresses of all its customers who purchased parts from Sutton. Likewise, Sutton testified that Comtec threatened a lawsuit against its competitor, Angel, to prevent it from selling dies for Comtec presses.

43.     In Comtec's letter to SPG stating its intention to refusal to deal with SPG, Comtec asserted that SPG's pie press was "unsafe" because it had been used with a third party die set.  The Declaration of James Sutton states that Comtec made similar assertions against him in his copyright infringement case and Comtec demanded that Sutton send letters to all of his customers stating that the dies he made for their Comtec machines might not be safe. By analogy, Ford might claim that Midas brand mufflers make Ford cars unsafe in order to gain a competitive advantage.  According to the Expert Report of Mr. Greenwald, there is no safety risk associated with operating pie presses with third party dies and I have seen no contrary evidence.  Accordingly, I have not seen any

evidence that would provide a pro-competitive justification for Comtec's refusal to deal with SPG.

44.     Even if Comtec could support its decision to refuse to service SPG's pie press that used the third-party dies, I have not seen any pro-competitive explanation for Comtec's (i) decision to refuse to service the presses once the third-party dies were removed, (ii) its decision to refuse to service SPG's other pie presses, (iii) its decision to refuse sell SPG a new pie press and (iv) its statement that it would refuse to provide replacement parts or service to "all future owners" of SPG's pie press.  These are all highly anticompetitive.  The Declaration of James Sutton describes additional anticompetitive actions by Comtec, such as its insistence that its competitors stop selling dies for Comtec presses and demanding that Sutton stop selling any dies or machines with "leaf springs," even when these parts were used in its competitors' machines.

45.     I have also reviewed other conduct by Comtec that demonstrates anticompetitive conduct. In 2014, Comtec filed a lawsuit against Mr. Sutton, alleging that he had violated Comtec's copyright by duplicating pages of the Comtec product manual. To resolve the lawsuit, it and Sutton entered into a Consent Judgment. The Consent Judgment prohibited Mr. Sutton not only from making copies of the manual, but also from selling, dealing in, or making Comtec parts, equipment, or supplies and parts that could be used with Comtec equipment. Further, the Consent Judgment required Mr. Sutton to refuse to assist any persons or entities with "anything relating to Comtec" and to provide Comtec with his customer list.  To my knowledge, nothing in the copyright laws would have permitted Comtec to have obtained such a result had it proceeded to trial on its claims; at best it could have received damages for copyright infringement. Comtec instead used this lawsuit to eliminate competition in the market for pie press parts and services. The consent judgment, through which Comtec has barred its admitted competitor from competing with it in the market for Comtec parts and services, is a

classical agreement in restraint of trade, which the antitrust laws were designed to prevent.

46.    Further, I understand that Comtec has counter-sued SPG in this litigation for inducement of copyright infringement, claiming that SPG acted illegally when it asked Mr. Sutton to make it a copy of the owner's manual for the Comtec machine that SPG owned.  This action shows that, if Comtec decides to terminate business relations with a customer (as it did with SPG), the customer will be unable to obtain parts, services and the operating manual for the machine itself.  Thus, the customer cannot make its own repairs in a safe manner.  Comtec's policy with respect to its owner's manual, which would tend to reduce the safe operation of its machines, also seems to undermine its purported "safety" justification for refusing to deal with SPG.

47.    Based on the above facts, it would be my opinion that Comtec's actions caused antitrust injury, in that they reduced the level of competition in the U.S. market for parts and services for Comtec's semi-automatic presses.

## VI.    ECONOMIC EVIDENCE RELATING TO SPG'S DAMAGES

48.    The combined effect of Comtec's refusal to deal with SPG and the Consent Judgment entered against Mr. Sutton prevented SPG from obtaining any service, support, or parts from any source for his pressing machine or obtain new semi-automatic pie presses.  In my view, there are several ways that Comtec's antitrust violations injured SPG.

49.    First, SPG has sustained a loss with respect to the value of the presses themselves and the parts purchased for them. As stated above, without regular servicing and replacement parts, the Comtec machines are not usable.  Indeed, I understand that SPG has not been able to use the machines. If SPG attempts to sell the machines to another party, that party would, according to Comtec's letter, also be prohibited from obtaining parts or services.  Thus the resale value of the machines is likely no greater than their salvage value (i.e., the value of any working parts that might be salvaged from

them, plus the scrap value of any metal parts).  While I have not done a full study of the salvage value of the parts in the machines, it is my experience that such value is typically less than 10% of the cost of working machines.  I understand from Plaintiff's answer to interrogatory number 10 that it invested $13,140.00 in the Comtec pie presses and parts. Assuming a salvage value of 10%, SPG lost $11,826.00.

50.    Second, SPG sustained losses with respect to the dies it purchased.  From what I understand, SPG purchased two sets of dies from Comtec for approximately $1,000 total.  In addition, SPG purchased dies from Jim Sutton d/b/a Inline Pies for approximately $6,000. Because the dies are custom-made to meet SPG's specifications for its pie size, shape, and design, the dies have no resale value.

51.    █████████████████████████████████
███████████████████████████████████████
████████████████████████████
███████████████████████████████████████
█████████████████████████████████████
█████████████████████████████████████
███████████████████████████████████████
████████████████████████████████████
███████████████████████████████████
████████████████████████████████████
████████████████████████

52.    Fourth, SPG would also be entitled to recover any lost sales due to Comtec's anti-competitive conduct. █████████████████████
███████████████████████████████████████
██████████████████████████████████████
███████████████████████████████████████
██████████████████████████████



---

[13] This includes information communicated to me by Mr. Mandel, as well as purchase orders received by SPG; excerpts from Mr. Mandel's handwritten notebooks from 2014; email correspondence sent and received by SPG and potential customers regarding purchase orders; email correspondence sent and received by SPG and third parties regarding SPG's production model and its need to transition; and SPG's financial statements from 2013-2015.



I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed on June 2, 2016 in New Brunswick, New Jersey.

_____
Thomas J. Prusa