UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x
  SAVORY PIE GUY, LLC f/k/a CHOCRA     :
  CHOCOLATE LLC, on behalf of itself and all  :
  others similarly situated,                :
                     Plaintiff,      :
                                  :
  v.                                  :
                                  :
  COMTEC INDUSTRIES, LTD.,        :
                     Defendant.    :
------------------------------------------------------------x

**OPINION AND ORDER**

14 CV 7527 (VB)

Briccetti, J.:

      Plaintiff Savory Pie Guy, LLC f/k/a Chocra Chocolate LLC, brings this action against

defendant Comtec Industries, Ltd., alleging antitrust violations pursuant to Section 2 of the

Sherman Antitrust Act (the "Sherman Act").  15 U.S.C. § 2.

      Before the Court is defendant's motion (i) for summary judgment, and (ii) to strike the

reports of plaintiff's expert, Dr. Thomas J. Prusa, and preclude any testimony by Dr. Prusa.

(Doc. #66).

      For the reasons set forth below, the motion for summary judgment is GRANTED.  The

motion to strike the reports of plaintiff's expert and to preclude his testimony is DENIED as

moot.

      The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331.

## BACKGROUND

I.    Factual Background

      The parties have submitted briefs, statements of facts, and declarations with supporting

exhibits, which reflect the following factual background.

A.    <u>The Parties and the Market for Semi-Automated Pie Presses</u>

Plaintiff is a small business that makes savory pies and sells them to food establishments and on direct order.  Defendant advertises, markets, and sells dough-forming equipment, including pie presses, for making pie crusts and tart shells.

Pie presses use aluminum or steel dies to press raw dough into baking tins.  First, a baking tin is placed in the lower die (called a nest).  The operator then places a ball of raw dough in the baking tin.  Finally, the operator pushes a lever, which raises the nest into the upper die (called a punch) to press the dough into a crust or shell.  Presses can create any number of sizes and shapes of crusts and shells.  Dies are typically custom-made to the user's specifications by a skilled machinist.  A full set of dies typically costs from $800 to more than $10,000, depending on the specifications.

Defendant manufactures and sells three different models of single-unit pie press machines:  (i) the Comtec 1100, which is a single-tier machine that forms pies on one tier; (ii) the Comtec 2200, which is a double-tier machine that forms pies on both tiers, or pies on one tier and pie tops on the other; and (iii) the Comtec 2900, which is a fully automatic dough forming machine.  Defendant also services and sells parts for its machines, including dies.

Plaintiff defines the relevant market as the market for single-unit dough forming equipment, service, and parts for entry-level pastry production (<u>i.e.</u>, equipment that can output approximately 250 pie crusts or tart shells per hour) in the United States.  Customers in the relevant market include small to mid-size bakeries, restaurants, hotels, banquet halls, cruise ships, cafeterias, and other food service providers in need of semi-automated processes for making pie crusts and tart shells.

Defendant is the largest seller of dough forming equipment in North America for entry-level pastry production.  There is also a substantial market for used machines manufactured by defendant, as well as parts and equipment for those machines, such as dies.

In a complaint defendant filed in 2014 in a different case, defendant claimed it had manufactured more than 10,000 dough forming machines since its founding in 1968 and had customers in more than fifty countries.  Plaintiff relies on this statement to demonstrate defendant's market share.  Defendant points out, however, that manufacturing data is not the equivalent of sales data, and that the relevant market here, as defined by plaintiff, is limited to the United States.  The record is otherwise devoid of any sales data regarding defendant's pressing machines.

Plaintiff also claims in late 2011 or early 2012, Jim Reilly, defendant's president, told Sean Mandel, plaintiff's owner, that defendant "had 90% of the market."  (Mandel Decl. ¶ 6). Defendant denies Reilly ever made such a comment, and points out the alleged comment makes no mention of the relevant market and does not make clear whether Reilly excluded the Comtec 2900, which is fully automatic and thus not a product in the relevant market.

Plaintiff claims defendant's only competitors in the relevant market during the time period relevant to this litigation were Angel Equipment, a company that has been manufacturing pie presses since 1999, and Jim Sutton d/b/a InLine Pie, a machinist who operates out of his garage.

Based on a declaration of Jim Sutton, who claims to have been the machinist and a machine builder at Angel Equipment from 2000 until 2003, plaintiff claims Angel sold fewer than ten new pie presses per year from 2000 to 2003.  To counter plaintiff's contention,

defendant has produced a declaration from Barry Hart, former owner and sales and marketing manager for Angel Equipment (Hart owned Angel from around 1998 until around January 2015). Hart claims that between approximately 2000 and 2003, Sutton was employed full time at Angel for less than a year, and otherwise on an as needed basis.  Hart further claims Sutton did not hold a managerial position, was not involved directly in sales, and was not provided with Angel's sales data.

InLine Pie manufactures semi-automatic pie presses, and sold 12 machines during 2015. Plaintiff claims InLine Pie began manufacturing semi-automatic pie presses in 2015, but defendant has produced evidence that InLine Pie was manufacturing and selling a semi-automatic pie press as early as 2013.

Defendant, on the other hand, has identified a "non-exhaustive" list of 31 competitors, including Angel Equipment, InLine Pie, and Pie Designs.  (McCrary Decl., Ex. 14).

B.      Plaintiff's Purchase of Pie Press Equipment:  2011-12

Plaintiff has never purchased a pie press directly from defendant.  In 2011, plaintiff purchased a used Comtec 2200 pie press on eBay from a third-party seller.

In the spring of 2012, defendant made and sold plaintiff a set of three customized die sets. During the summer of 2012, defendant made and sold plaintiff another set of two customized dies.

In the fall of 2012, plaintiff attempted to contact defendant to request additional customized die sets for its Comtec 2200 pressing machine.  Plaintiff claims it made multiple phone calls to defendant to request a die set that made twelve mini-pies per press and a set that

made four regular-sized pies per press.  Defendant did not return plaintiff's calls, and plaintiff

looked at other options for purchasing new die sets.

In September 2012, plaintiff contacted InLine Pie, and asked it to make the desired die

sets.  InLine Pie made the requested mini pie die set, but did not complete the die set for pressing

four regular sized pies per press.

C.      Defendant's Alleged Anti-Competitive Conduct

In early October 2013, Mandel attended the International Baking Industry Expedition (the

"IBIE") in Las Vegas.  Defendant had a booth at the IBIE where Mandel discussed the Comtec

2900 with Jim Reilly.  Mandel asked if he could use the die sets plaintiff purchased from

defendant in 2012 with the Comtec 2900 pressing machine.  Reilly told Mandel those dies should

work with some modifications.  Mandel also told Reilly he had a die set made by a third party

and asked if that set would also work with the Comtec 2900.  Reilly said that should not be a

problem.

On or about October 21, 2013, Mandel contacted defendant to request a written quote for

the Comtec 2900.  Joseph Reilly, Comtec's vice president, responded he was busy but he would

send a quote shortly.  When plaintiff did not receive the requested quote, Mandel again contacted

defendant via telephone.  Defendant did not return plaintiff's telephone call, but instead sent

plaintiff an email on November 13, 2013, stating:

> Comtec Industries has learned that you are using Comtec Pie and Tart presses with
> parts and forming dies that were not manufactured by Comtec Industries.
>
> Comtec Industries considers these machines unsafe because of these parts.  We
> cannot prevent anyone from using such a machine, but we can withhold our implied
> approval by not providing parts or service to Sean Mandel, [plaintiff], and any other
> businesses that you may own from this point forward.  Consequently, we will not
> manufacture any forming dies for or supply any future parts, equipment or service
> to you or your businesses.

> Because these machines and any future machines used by your business are considered by Comtec Industries to be unsafe, we will continue to deny [sic] provide parts or service to you and to all future owners of these machines.

(Goldfarb Decl., Ex. F).

Following defendant's decision to stop doing business with Mandel and his companies, Mandel informed defendant it was "not the only game in town" and that Mandel and his companies would "throw [their] support to the various 3rd party companies that have sprouted up to support [defendant's] machines in light of [defendant's] incredibly poor and mercurial customer service."  Mandel went on to say, "When I or my colleagues decide to buy new equipment, I'll give my business to Colbourne [sic] or Pie Designs."  (Goldfarb Decl., Ex. G).

Defendant claims the reason it terminated its relationship with Mandel and his companies was, among other things, that Mandel "repeatedly enlisted [defendant] to perform free R&D under the guise of contemplating future orders with [defendant], which orders rarely materialized, and because it became clear that Mr. Mandel utilized and tinkered with the machines in such a manner that [defendant] could no longer warranty the safe operation of such machines."  (Reilly Decl. ¶ 15).  Defendant claims plaintiff spent approximately $2,500 on equipment purchased directly from defendant during their two-year plus relationship.

Following defendant's decision to stop doing business with plaintiff, plaintiff purchased a Comtec 1100 from InLine Pie in or around December 2013, for $1,500.  In or around March 2014, plaintiff purchased another Comtec 1100 at an auction from a third party for $1,200.

On March 27, 2014, defendant sued Jim Sutton and InLine Pie in the Northern District of Illinois alleging Sutton and InLine Pie (i) copied and distributed defendant's operator's manual for its Model 2200 pie press, and (ii) sold aftermarket dies that were marketed as "Comtec dies."

6

Sutton and InLine Pie subsequently entered into a consent judgment that restrained them in

pertinent part from:

    a.      Selling, trading, distributing or otherwise dealing in Comtec equipment, supplies, or parts;

    b.      Facilitating or directly or indirectly buying, trading, consulting, referring, manufacturing, or dealing in Comtec equipment or those parts that can be placed on or into and used with Comtec equipment without any modifications or additions whatsoever;

    c.      Making directly or indirectly any fittings, mounting hardware fixtures, appliances, jigs, or the like that allow any parts to fit readily on or into Comtec equipment; and

    d.      Making apertures, arms, fittings, mounting hardware or the like on or to any parts that will enable another to readily assemble a part suitable for use with Comtec equipment.

(Sutton Decl., Ex. 7).

    The consent judgment also provides:

    [Sutton] shall send . . . a letter to all customers to whom parts were sold for Comtec machines stating that the parts were not genuine Comtec parts, were not manufactured to Comtec standards, that continued use of the parts may present a hazard to the machine or its operator, that Sutton/InLine Pie will no longer service, support or supply parts for Comtec machines, and that any manuals that were provided were reproduced and sent in violation of the United States Copyright Act and should be destroyed.  [Sutton] shall provide to Comtec copies of all letters delivered and confirmation of delivery within 30 days of the date of entry of this Order.

(Id.).

    Plaintiff claims defendant has used the consent judgment to attempt to prevent Sutton

from selling not only parts and services for defendant's machines, but also dies and presses that

contain leaf springs (which are a connection point for the upper die halves in presses) even

though leaf springs are not unique to defendant's presses.

7

Plaintiff also claims defendant threatened to sue Angel Equipment in a cease and desist letter when it learned Angel made and sold dies for defendant's presses.  Defendant, however, has produced a declaration from Barry Hart, the former owner and marketing manager of Angel, which states defendant never threatened Angel with litigation or otherwise.  Hart also asserts defendant's behavior "did not exclude Angel from participating in the market for semi-automatic pie presses, or any other market."  (Hart Decl. ¶ 10).

Plaintiff alleges the combined effect of defendant's refusal to deal with plaintiff and the consent judgment entered against Sutton and InLine Pie prevents plaintiff from obtaining service, support, or parts from any source for its pressing machines.  This, in turn, effectively prevented plaintiff from creating and selling its savory pies.  The record shows, however, that plaintiff continued to use the equipment manufactured by defendant until it transitioned its production of savory pies to a third party.

D.     Allegations in the Complaint

The complaint, brought by plaintiff on behalf of itself and a putative class of purchasers,[1] claims defendant unlawfully excluded, impeded, and restrained competition for dough forming equipment, parts, and services.  The complaint further claims defendant devised and implemented a scheme to improperly deal with its customers who purchased dough forming equipment, parts, or services from defendant's competitors for the anticompetitive purpose of impeding rivals so that defendant could sell its products at supracompetitive prices in violation of Section 2 of the Sherman Act.

---

[1]     Plaintiff never moved for class certification, and its time to do so has expired.

**DISCUSSION**

I.    Summary Judgment Standard

The Court must grant a motion for summary judgment if the pleadings, discovery

materials before the Court, and any affidavits show there is no genuine issue as to any material

fact and it is clear the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P.

56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

A fact is material when it "might affect the outcome of the suit under the governing

law . . . .  Factual disputes that are irrelevant or unnecessary" are not material and thus cannot

preclude summary judgment.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

A dispute about a material fact is genuine if there is sufficient evidence upon which a

reasonable jury could return a verdict for the non-moving party.  See id.  The Court "is not to

resolve disputed issues of fact but to assess whether there are any factual issues to be tried."

Wilson v. Nw. Mut. Ins. Co., 625 F.3d 54, 60 (2d Cir. 2010) (citation omitted).  It is the moving

party's burden to establish the absence of any genuine issue of material fact.  Zalaski v. City of

Bridgeport Police Dep't, 613 F.3d 336, 340 (2d Cir. 2010).

If the non-moving party has failed to make a sufficient showing on an essential element

of its case on which it has the burden of proof, then summary judgment is appropriate.  Celotex

Corp. v. Catrett, 477 U.S. at 323.  If the non-moving party submits "merely colorable" evidence,

summary judgment may be granted.  Anderson v. Liberty Lobby, Inc., 477 U.S. at 249–50.  The

non-moving party "must do more than simply show that there is some metaphysical doubt as to

the material facts, and may not rely on conclusory allegations or unsubstantiated speculation."

Brown v. Eli Lilly & Co., 654 F.3d 347, 358 (2d Cir. 2011) (internal citations omitted).  The

mere existence of a scintilla of evidence in support of the non-moving party's position is

likewise insufficient; there must be evidence on which the jury could reasonably find for it.

Dawson v. Cnty. Of Westchester, 373 F.3d 265, 272 (2d Cir. 2004).

On summary judgment, the Court construes the facts, resolves all ambiguities, and draws

all permissible factual inferences in favor of the non-moving party.  Dallas Aerospace, Inc. v.

CIS Air Corp., 352 F.3d 775, 780 (2d Cir. 2003).  If there is any evidence from which a

reasonable inference could be drawn in favor of the non-moving party on the issue on which

summary judgment is sought, summary judgment is improper.  See Sec. Ins. Co. of Hartford v.

Old Dominion Freight Line Inc., 391 F.3d 77, 83 (2d Cir. 2004).

In deciding a motion for summary judgment, the Court need only consider admissible

evidence.  Nora Bevs., Inc. v. Perrier Grp. Of Am. Inc., 164 F.3d 736, 746 (2d Cir. 1998).

Summary judgment "is particularly favored" in the antitrust context "because of the

concern that protracted litigation will chill pro-competitive market forces."  PepsiCo, Inc. v.

Coca-Cola Co., 315 F.3d 101, 104 (2d Cir. 2002).

II.     Section 2 of the Sherman Act

Section 2 of the Sherman Act prohibits the monopolization or attempted monopolization

of "any part of the trade or commerce among the several States."  15 U.S.C. § 2.  Plaintiff alleges

defendant both monopolized and attempted to monopolize the entry-level market for semi-

automatic pie presses.

The Court will address each claim in turn.

A.    Monopolization Claim

To prevail on a monopolization claim, a plaintiff must establish "(1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power." PepsiCo, Inc. v. Coca-Cola Co., 315 F.3d 101, 105 (2d Cir. 2002) (quoting United States v. Grinnell Corp., 384 U.S. 563, 570–71 (1966)).  "The willful acquisition or maintenance of monopoly power is to be distinguished from growth or development that is the result of superior product, business acumen or historical accident." Geneva Pharm. Tech. Corp. v. Barr Labs. Inc., 386 F.3d 485, 495 (2d Cir. 2004).

For the reasons that follow, the Court concludes summary judgment is appropriate on the monopolization claim because plaintiff cannot show defendant had monopoly power in the relevant market.

1.    Relevant Market

"Proof of the relevant product market is a necessary element of a cause of action for monopolization." Nifty Foods Corp. v. Great Atlantic & Pac. Tea Co., Inc., 614 F.2d 832, 840 (2d Cir. 1980).  A relevant market for a product may be defined as "products that have reasonable interchangeability for the purposes for which they are produced—price, use and qualities considered." PepsiCo, Inc. v. Coca-Cola Co., 315 F.3d at 105 (quoting United States v. E.I. du Pont de Nemours & Co., 351 U.S. 377, 404 (1956)).  "The relevant market consists of all of the products that the [defendant's] customers view as substitutes to those supplied by the [defendant]." Id.  (internal quotation marks omitted).

Plaintiff defines the relevant market as the "market for single unit dough forming equipment, service, and parts for entry-level pastry production (i.e., equipment that can output

11

approximately 250 pie crusts and/or tart shells per hour)" in the United States.  (Compl. ¶ 17).

According to the complaint, customers in the relevant market include small to medium sized

bakeries, restaurants, hotels, banquet halls, cruise ships, cafeterias, and other food service

providers who use semi-automated processes to make pie crusts and tart shells.  (Id.).

A single sentence in defendant's reply brief contends defendant "has demonstrated that

[p]laintiff has purposely and without justification excluded competitors that should be included

in any analysis of market share, and thus, [p]laintiff's definition of the [r]elevant [m]arket is

unacceptable and any data it claims in support of its analysis is rendered moot."  (Def.'s Reply

Br. at 2).  However, this statement is not further expanded upon, and various other arguments in

defendant's briefs assume the relevant market is as defined by plaintiff.

Accordingly, although the record contains some evidence contradicting plaintiff's

definition of the relevant market, the Court assumes for purposes of this motion that the relevant

market is the "market for single unit dough forming equipment, service, and parts for entry-level

pastry production" in the United States.

### 2.   Monopoly Power

The next question is whether plaintiff has raised a genuine issue of material fact as to

whether defendant possessed monopoly power in the relevant market.  The Court concludes

plaintiff has failed to do so.

Monopoly power, also known as market power, is "the power to control prices or exclude

competition."  Tops Markets, Inc. v. Quality Markets, Inc., 142 F.3d 90, 97–98 (2d Cir. 1998)

(internal quotation marks omitted).  Monopoly power may be proven "directly by evidence of the

control of prices or the exclusion of competition, or it may be inferred from one firm's large percentage share of the relevant market."  Id. at 98.

Where direct evidence is unavailable or inconclusive, monopoly power may be inferred from high market share.  Geneva Pharm. Tech. Corp. v. Barr Labs. Inc., 386 F.3d at 500.  While market share is not the equivalent of monopoly power, it is highly relevant to the determination of monopoly power.  Id.  "[T]he higher a market share, the stronger is the inference of monopoly power."  Tops Markets, Inc. v. Quality Markets, Inc., 142 F.3d at 98 (internal quotation marks omitted).

Courts draw an inference of monopoly power only after consideration of the relationship between market share and other relevant market characteristics.  Id.  These characteristics include the "strength of the competition, the probable development of the industry, the barriers to entry, the nature of the anticompetitive conduct and the elasticity of consumer demand."  Geneva Pharm. Tech. Corp. v. Barr Labs. Inc., 386 F.3d at 500 (internal quotation marks omitted).  The Second Circuit has held that "a market share below 50% is rarely evidence of monopoly power, a share between 50% and 70% can occasionally show monopoly power, and a share above 70% is usually strong evidence of monopoly power."  Broadway Delivery Corp. v. United Parcel Serv. of Am., Inc., 651 F.2d 122, 129 (2d Cir. 1981).  Nonetheless, such evidence does not conclusively establish monopoly power.  Id. at 128 ("[T]he true significance of market share data can be determined only after careful analysis of the particular market.").

Both plaintiff and defendant may introduce evidence regarding these other market factors to determine whether a defendant possesses monopoly power.  Tops Markets, Inc. v. Quality Markets, Inc., 142 F.3d at 99.  Because defendant moved for summary judgment here, it has the

burden of demonstrating there was insufficient factual support for the claim that defendant had monopoly power.  Hayden Publ'g Co., Inc. v. Cox Broad. Corp., 730 F.2d 64, 69 (2d Cir. 1984).

Plaintiff has produced evidence of defendant's market power in the form of declarations of Sean Mandel, Jim Sutton, and Dr. Thomas Prusa, plaintiff's economics and damages expert. Plaintiff argues there are no substitutes for semi-automatic pie presses because semi-automatic pie presses are distinct from both manual pie presses and fully-automatic pie presses in their physical space requirements, operator requirements, production volume, and cost.  Plaintiff's expert concluded defendant had a market share of at least 50%, and that it was likely much higher.  The evidence produced by plaintiff, however, is insufficient to establish defendant's monopoly power.  See Broadway Delivery Corp. v. United Parcel Serv. of Am., Inc., 651 F.2d at 128 ("The trend of guidance from the Supreme Court and the practice of most courts endeavoring to follow that guidance has been to give only weight and not conclusiveness to market share evidence.").

In particular, Prusa testified at his deposition that sales of new equipment in a given market should be reviewed in calculating a firm's market share in such market.  Prusa's expert reports, however, do not rely on any sales data in concluding that defendant had market share of at least 50%, and likely much higher.  In forming his opinion, Prusa relied on Mandel's representation of his conversation with Jim Reilly, during which Reilly allegedly said defendant had 90% of the market.

Prusa's opinion regarding defendant's market share is also based on (i) the November 23, 2015, statement of Sean Mandel and the Declaration of James Sutton stating that: (a) the machine offered by InLine Pie has only been available for a short time period (i.e., InLine Pie

14

started selling the presses in 2015), (b) the number of installed semi-automatic presses made by Angel Equipment and InLine Pie in the baking industry is small, (c) the combined annual sales of Angel and InLine Pie is less than twenty-five pie presses, and (d) defendant has the predominate and overwhelming majority of the market share; and (ii) Prusa's Google and eBay searches and review of several Internet websites specializing in used bakery equipment to investigate new and used semi-automatic presses available for sale.

Defendant disputes the comment attributed to Reilly regarding defendant's market share and points out the contested statement makes no mention of the relevant market, nor does it make clear whether Reilly excluded the Comtec 2900, which is fully automatic and thus not a product in the relevant market.  Moreover, whether or not the alleged conversation regarding defendant's market share took place is immaterial according to defendant, because the record contains no sales data.  Furthermore, defendant takes issue with plaintiff's reliance on the statement that defendant has manufactured over 10,000 presses that have been offered for sale in over fifty countries in the last forty-plus years, because sales data rather than manufacturing data is indicative of market share and here, the relevant market is limited to the United States. Plaintiff counters by arguing that sales data is not required to prove market share.

In reviewing possible market participants, Prusa claims to have spoken by telephone with Linda Hoskins from Colborne Foodbotics ("Colborne"), another leading manufacturer of pie presses.  Based on this conversation and a review of Colborne's website, Prusa testified that Colborne does not participate in, nor is it interested in entering, the semi-automated pie press

15

market.  Defendant counters that Colborne does indeed manufacture and sell semi-automated pie presses.[2]

While plaintiff argues that during the time period relevant to this litigation defendant's only competitors in the relevant market were Angel Equipment and InLine Pie, defendant has identified thirty-one competitors.  Plaintiff and its expert excluded twenty-seven of the competitors identified by defendant on the basis that foreign manufacturers do not make U.S.-compatible equipment.  However, defendant has produced evidence that South African-based Pie Designs and Solutions, the first company defendant listed as a competitor, does indeed have customers in the United States.  Furthermore, following defendant's decision in 2013 to no longer transact business with plaintiff, Mandel informed defendant via email that it was "not the only game in town" and that Mandel would "throw [his] support to the various 3rd party companies that have sprouted up to support [defendant's] machines in light of [defendant's] incredibly poor and mercurial customer service."  Mandel's email continued, "When I or my colleagues decide to buy new equipment, I'll give my business to Colbourne [sic] or Pie Designs."  (Goldfarb Decl., Ex. G).

With regard to market characteristics, plaintiff argues the market for semi-automatic pie presses in the United States is highly concentrated and competition is weak.  As to probable future developments in the industry for semi-automatic pie presses, plaintiff claims it is improbable that defendant's market share will decrease over time since defendant has been in business for more than forty years and has well-established brand recognition.  Plaintiff asserts

---

[2]     Sutton's declaration claims the semi-automatic pie press offered for sale by Colborne is actually made by Angel Equipment.

16

that because defendant's competitors have struggled to make significant sales and defendant's market share has persisted over time, it is unlikely that competitors will be able to compete successfully in the future.

Plaintiff also claims that defendant's reputation, brand loyalty, and economies of scale in the manufacturing process prohibit new firms from successfully competing with defendant and constitute significant barriers to entry.  However, "the mere existence of a brand and brand identification in the marketplace are not synonymous with market power."  In re Wireless Tel. Servs. Antitrust Litig., 385 F. Supp. 2d 403, 419 (S.D.N.Y. 2005) (citing Grappone, Inc. v. Subaru of New England, Inc., 858 F.2d 792, 797 (1st Cir. 1988)).

Defendant refutes plaintiff's argument by pointing out several examples of well-known brand names in other industries that subsequently declined and were overtaken by competitors. Defendant further points to emerging technologies in the industry, such as 3-D printing and direct metal laser sintering, and to evidence in the record that demonstrates plaintiff possesses CAD technology, has existing relationships with computer numerical control machinists, and has itself shown the ability to perform numerous repairs to its equipment manufactured by defendant. Moreover, the fact that InLine Pie began manufacturing and selling its own semi-automated pie press in 2015 (or possibly earlier) demonstrates the relevant market lacks significant barriers to entry.  Defendant also notes that it was founded by an unskilled machinist with no formal engineering or other formal training related to machinery.

Plaintiff subsequently contracted with a third-party, Morrison Lamothe Inc. ("MLI"), to produce its savory pies.[3]  In plaintiff's responses to defendant's first set of interrogatories, plaintiff states that to the best of its knowledge, MLI uses a spiral mixer and a sheeter, both of which are manufactured by companies other than defendant.  The fact that MLI uses equipment other than that manufactured by defendant to produce plaintiff's savory pies, calls into question plaintiff's claims regarding the elasticity of demand and available substitutes for defendant's pie presses.

On this record, the only reasonable inference is that defendant lacks monopoly power. Despite defendant's likely high market share, the remaining evidence—such as low barriers to entry and other market characteristics—does not support the conclusion that defendant can control prices or exclude competition.  Therefore, plaintiff's monopolization claim must fail.

B.   Attempted Monopolization Claim

To state an attempted monopolization claim, a plaintiff must establish "(1) that the defendant has engaged in predatory or anticompetitive conduct with (2) a specific intent to monopolize and (3) a dangerous probability of achieving monopoly power."  PepsiCo, Inc. v. Coca-Cola Co., 315 F.3d at 105 (quoting Spectrum Sports, Inc. v. McQuillan, 506 U.S. 447, 456 (1993)).

Although plaintiff has raised triable issues of fact with respect to the anticompetitive conduct and specific intent elements, because the Court concludes plaintiff cannot show

---

[3]    MLI is located in Canada, which undercuts plaintiff's claim that non-U.S. based market participants should be excluded from the relevant market.

defendant had a dangerous probability of achieving monopoly power, defendant is entitled to summary judgment on plaintiff's attempted monopolization claim.

           1.    <u>Anticompetitive Conduct</u>

The Second Circuit has not articulated precise rules for what constitutes anticompetitive conduct, and thus there is no clear standard for determining when behavior is anticompetitive and when it is efficient and pro-competitive.  As the Supreme Court has acknowledged, "it is sometimes difficult to distinguish robust competition from conduct with long-term anticompetitive effects." <u>Spectrum Sports, Inc. v. McQuillan</u>, 506 U.S. at 459.  The relevant inquiry is the fact-specific question of whether the challenged conduct is "exclusionary" or "predatory." <u>Aspen Skiing Co. v. Aspen Highlands Skiing Corp.</u>, 472 U.S. 585, 602 (1985).

Plaintiff contends defendant has engaged in anticompetitive conduct by refusing to deal with its customers that purchase parts or services for defendant's presses from defendant's competitors.

"As a general rule, businesses are free to choose the parties with whom they will deal, as well as the prices, terms, and conditions of that dealing." <u>Pac. Bell Tel. Co. v. Linkline Commc'ns, Inc.</u>, 555 U.S. 438, 448 (2009).  "A refusal to deal is generally not unlawful unless it is done for the purpose of monopolization." <u>Port Dock & Stone v. Oldcastle Ne., Inc.</u>, 507 F.3d 117, 124 (2d Cir. 2007).  The absence of a valid business purpose for the defendant's refusal to deal may provide circumstantial evidence of improper intent.  <u>See Aspen Skiing Co. v. Aspen Highlands Skiing Corp.</u>, 472 U.S. at 608.  Here, defendant asserts it decided to terminate its relationship with plaintiff because it no longer desired to do business with "an exceedingly

demanding client who saw [defendant] as a free R&D department" and who "showed a basic disregard for the safe operation of [defendant's] machines."  (Def. Br. at 2; Reilly Decl. ¶ 15).

Plaintiff contends, and it has produced supporting evidence in the form of an expert report of Christopher Greenwald, that defendant's assertion that plaintiff's pressing machine was unsafe because it had been used with dies made by someone other than defendant, is meritless. Greenwald opines that defendant's pressing machines can be used safely with dies manufactured by third party skilled machinists.  Plaintiff thus claims defendant's reliance on safety was merely an attempt to justify its anti-competitive conduct.  However, plaintiff has not offered any evidence tending to show defendant's decision to terminate its relationship with plaintiff excluded potential competitors, impaired the opportunity of rival firms, had an exclusionary or anticompetitive effect, or that it enabled defendant to charge monopolistic overcharges in the relevant market.[4]

Plaintiff further claims defendant has excluded its competitors—InLine Pie and Angel Equipment—from free participation in the market.  Specifically, defendant sued Jim Sutton and InLine Pie for copyright infringement and entered into a consent judgment under which Sutton can "no longer service, support or supply parts for Comtec machines."  (Sutton Decl. ¶¶ 13–19, Ex. 7).  Sutton was also enjoined from "selling, trading, distributing or otherwise dealing in Comtec equipment, supplies, or parts."  (Id. Ex. 7 at 2).  Plaintiff further asserts defendant has attempted to prevent Sutton from selling dies and presses that contain leaf springs, which are a connection point for the upper die halves in presses, even though such leaf spring connection

---

[4]     The record also demonstrates plaintiff continued using equipment that had been manufactured by defendant until it transitioned production to a third party.

points are not unique to defendant.  Finally, plaintiff claims defendant sent Angel a cease and

desist order threating to sue when it learned Angel made and sold dies for defendant's presses.

Defendant has produced evidence, however, in the form of a declaration of Barry Hart, the

former owner and sales and marketing manager for Angel, refuting this claim.

Although nothing prevents defendant from protecting its intellectual property, and

defendant's other alleged conduct has not prevented Sutton and Angel Equipment from entering

and remaining in the relevant market,[5] the Court concludes plaintiff has produced sufficient

evidence for a reasonable factfinder to conclude defendant's conduct was anticompetitive.

### 2.   Specific Intent to Monopolize

While the completed offense of monopolization requires only a general intent, a specific

intent to eliminate competition or build a monopoly is an essential element of attempted

monopolization.  Tops Markets, Inc. v. Quality Markets, Inc., 142 F.3d at 101.  A factfinder may

reasonably infer a specific intent to destroy competition from defendant's conduct.  Id.

Because plaintiff has raised a triable question of fact regarding defendant's alleged

anticompetitive conduct, the Court concludes a jury could also reasonably find defendant's

conduct was not motivated by a valid business justification and was instead intended to exclude

its competition from the relevant market.

### 3.   Dangerous Probability of Achieving Monopoly Power

"Critical to deciding the dangerous probability prong of plaintiff's attempted

monopolization claim is defendant's economic power in the relevant market."  Tops Markets,

---

[5]      The Court notes that defendant's conduct has not prevented plaintiff from continuing to
operate either.

Inc. v. Quality Markets, Inc., 142 F.3d at 100.  Attempted monopolization requires some degree
of market power, and in considering the likelihood of achieving monopoly power, courts employ
the same concept of market power as that used in a completed monopolization claim—the
defendant's relevant market share in light of other market characteristics, including barriers to
entry.  Id.  However, "a lesser degree of market power may establish at attempted
monopolization claim than that necessary to establish a completed monopolization claim."  Id.

Applying this standard, and based on the record presented, defendant is entitled to
summary judgment on the attempted monopolization claim.  Viewing the evidence in the light
most favorable to plaintiff, a jury could not reasonably find there was a dangerous probability
that defendant would monopolize the market for semi-automatic pie presses.  During the time
period in question, at least one competitor—InLine Pie—was able to enter the market.  Plaintiff
itself acknowledged defendant was "not the only game in town" and that there were "various 3rd
party companies that [had] sprouted up to support [defendant's] machines."  Furthermore,
following the termination of its relationship with defendant, plaintiff was able to contract with
MLI to produce its savory pies, and to the best of plaintiff's knowledge, MLI does so without the
use of equipment manufactured by defendant.

That plaintiff has produced evidence tending to show defendant has significant market
share, and that plaintiff's expert concluded defendant had at least a 50% market share, is not
enough to establish a dangerous probability of achieving monopoly power.  See Int'l Distrib.
Ctrs., Inc. v. Walsh Trucking Co., Inc., 812 F.2d 786, 792 (2d Cir. 1987) ("unlikely" that even
with a 50% market share defendant could raise prices without losing business to its competitors);
United States v. Waste Mgmt., Inc., 743 F.2d 976, 983–84 (2d Cir. 1984) (projected 48.8%

market share of corporation after proposed merger insufficient to support a finding that merger

would violate section 7 of the Clayton Act where the barriers to entry were insubstantial).

Considering the conditions in the market for semi-automated pie presses, the evidence

does not establish that defendant's market share was sufficiently significant to give rise to a

dangerous probability that it would monopolize the market, even when its allegedly

anticompetitive conduct is taken into account.  A trier of fact could not reasonably find that such

a probability existed.

III.   Antitrust Injury

Notwithstanding the fact that the Court concludes defendant is entitled to summary

judgment on the monopolization and attempted monopolization claims, lack of antitrust injury

provides an alternative reason for granting summary judgment.

Plaintiff claims its injuries consist of the loss of value of its presses and dies

manufactured by defendant,[6] costs incurred to transition plaintiff's pie production to a third

party, and lost sales.  Plaintiff claims its total losses caused by defendant's conduct amount to at

least $434,660.  Plaintiff's expert did not opine on monopolist overcharges, and plaintiff seems

to no longer be alleging such injury.

The Clayton Act, 15 U.S.C. § 15, creates a private right of action for parties like plaintiff

to sue under federal antitrust laws, including the Sherman Act.  Section 4 of the Clayton Act

states, in pertinent part, that "any person who shall be injured in his business or property by

reason of anything forbidden in the antitrust laws may sue therefor in any district court of the

---

[6]     Plaintiff claims to have spent $13,140 on its defendant-manufactured pie presses, dies, and parts for those presses.  Defendant claims plaintiff spent less than $2,500 on equipment purchased directly from defendant.

United States . . . , and shall recover threefold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee." 15 U.S.C. § 15(a). Despite the broad language of Section 4, "courts have carefully parsed antitrust standing in order to avoid counter-productive use of antitrust laws in ways that could harm competition rather than protecting it." Port Dock & Stone v. Oldcastle Ne., Inc., 507 F.3d at 121.

A threshold requirement for proceeding under the Clayton Act is to show that plaintiff has suffered an antitrust injury, which is defined as an "injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendant['s] acts unlawful." Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc., 429 U.S. 477, 489 (1977). An antitrust plaintiff must prove more than harm to its own business or the loss of a competitor. Instead, it must prove harm to competition as a whole in the relevant market. Capital Imaging Assocs., P.C. v. Mohawk Valley Med. Assocs., 996 F.2d 537, 543 (2d Cir. 1993); see also Balaklaw v. Lovell, 14 F.3d 793, 797 (2d Cir.1994) (plaintiff "must show more than that the defendants' conduct caused [it] an injury."). Although an injury may be causally related to an antitrust violation, it will nevertheless not qualify as an "antitrust injury" unless it is attributable to the anti-competitive aspect of the conduct under scrutiny, "since it is inimical to the antitrust laws to award damages for losses stemming from continued competition." Atl. Richfield Co. v. USA Petroleum Co., 495 U.S. 328, 334 (1990).

Here, plaintiff has produced no evidence of the classic antitrust injury—monopolist overcharges. See, e.g., AD/SAT v. Assoc. Press, 181 F.3d 216, 227 (2d Cir. 1999) (defining monopoly power as ability to sustain price substantially above competitive level for significant time); see also Yellow Page Sols., Inc. v. Bell Atl. Yellow Pages Co., 2001 U.S. Dist. LEXIS

18831, *11 (S.D.N.Y. Nov. 19, 2001) (noting "there is no antitrust injury absent an allegation that defendants' pricing is predatory").  Instead, the only injuries as to which plaintiff's expert has opined are (i) the loss plaintiff suffered from the loss in value of its presses and dies manufactured by defendant, (ii) costs associated with transitioning plaintiff's production method, and (iii) lost sales.

Because it was not unlawful for defendant to terminate its relationship with plaintiff, the alleged injuries do not constitute antitrust injuries recoverable under the Sherman or Clayton Acts.  See, e.g., Port Dock & Stone Corp. v. Oldcastle Ne., Inc., 507 F.3d at 123–24 (terminated dealer had no standing to bring suit under the Sherman Act for monopolization because "the dealer's injury was caused by the manufacturer's decision to terminate their relationship, something the manufacturer could have just as well done without having monopoly power"); Agency Dev., Inc. v. Med Am. Ins. Co., 310 F. Supp. 2d 538, 545 (W.D.N.Y. 2004) (plaintiff's alleged drop in sales and lost profits was not the result of any anticompetitive conduct of defendants, but instead was the result of the lawful termination of an agency contract, which could not serve as the basis for an antitrust claim).

IV.     Plaintiff's Economic Expert's Reports

Because defendant's motion for summary judgment is granted, the Court need not reach the issue of whether to strike plaintiff's economic expert's reports, or whether he should be precluded from testifying at trial.

**CONCLUSION**

Defendant's motion for summary judgment is GRANTED.

Defendant's motion to strike the reports of plaintiff's economic expert and to preclude his testimony is DENIED as moot.

The Clerk is instructed to terminate the motion (Doc. #66) and close this case.

Dated: December 28, 2016
      White Plains, NY

                    SO ORDERED:

                    Vincent L. Briccetti
                    United States District Judge